**Pierre JENKINS (A.K.A. Pierre Burton), Plaintiff–Appellant,**

v.

**CITY OF NEW YORK, New York City Police Department, Walter Mack, Detective, Shield No. 4235, Jerome Parrino, Detective, Shield No. 1734, Steven Hunter, Detective, Shield No. 1344 and Robert Shulman, Detective, Shield No. 5456, Defendants–Appellees.**

**Docket No. 06–0182–CV.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 15, 2006.

Decided: Feb. 6, 2007.

---

Robert G. Androsiglio, Radna & Androsiglio, LLP, New York, NY, for Plaintiff–Appellant.

Michael A. Cardozo, Corporation Counsel of the City of New York, New York,

N.Y. (Pamela S. Dolgow, Sheryl Bruzzese, Fay Ng, on brief), for Defendants–Appellees.

Before: CALABRESI, WESLEY, Circuit Judges, OBERDORFER, District Judge.[*]

WESLEY, Circuit Judge.

Plaintiff-appellant Pierre Jenkins filed claims of false arrest and malicious prosecution under 42 U.S.C. § 1983 and New York law, as well as state law claims of libel, slander and intentional infliction of emotional distress, against defendants-appellees—the City of New York, the New York City Police Department (NYPD) and Detectives Mack, Parrino, Hunter and Schulman. Jenkins appeals from a December 8, 2005 judgment of the district court (Glasser, *J.*) granting defendants' motion for summary judgment and dismissing all claims. For the reasons stated below, we vacate in part and affirm in part, and remand to the district court for further proceedings consistent with this opinion.

## BACKGROUND

Between June 21 and July 12, 1999, a series of robberies and a homicide occurred in Brooklyn, New York. Based on witness and victim descriptions, the police came to believe that the same person was involved in each of the crimes. In a number of the robberies and the homicide, witnesses indicated the participation of a second individual. The robberies were labeled "Robbery Pattern 101" and assigned to Detective Parrino of the Brooklyn Robbery Squad, and the homicide was assigned to Detective Mack at the 73rd Precinct in Brooklyn.

---

[*] The Honorable Louis F. Oberdorfer, United States District Court for the District of Columbia, sitting by designation.

During the first robbery, the victim's red Honda Civic was stolen. The Honda was subsequently described by five of the other robbery victims as the vehicle used by their assailants. When police recovered the Honda on July 13, 1999, they discovered, along with property belonging to one of the robbery victims, the fingerprints of Derrick Blyther. On July 15, 1999, Detectives Parrino, Schulman and Hunter went with members of the Brooklyn Robbery Squad to Blyther's apartment to arrest him.[1]

What happened next is in sharp dispute. By Jenkins' and Blyther's account, early that morning they were startled by a loud banging at the door and, when Blyther opened the door, they claim, the police burst in with guns drawn, threw Blyther to the ground and placed him in handcuffs. Other officers headed straight for Jenkins, who was sitting on the couch, forced him to the ground and placed him in handcuffs as well. Blyther and Jenkins insist that at no point did they attempt to flee.

The police offer a different account. The police contend that upon knocking on Blyther's door and announcing their presence Blyther and Jenkins came running out of the apartment. Detectives tackled both men and placed them in handcuffs. In his deposition, Detective Mack testified that tackling a suspect who attempts to flee constitutes the use of physical force and would be noted in a police report. Yet, the Means of Apprehension form prepared by Detective Hunter on the date of arrest makes no mention of the suspects' attempted flight or use of physical force during the arrest. Neither Jenkins nor Blyther was charged with resisting arrest. Not a single post-arrest document suggests that either Jenkins or Blyther attempted to flee the apartment. In their depositions in this action, however, Detectives Amodeo and Hunter recounted the escape attempt.

Jenkins and Blyther were taken to the precinct and placed in lineups by Detective Mack. Jason Chambers, who witnessed the murder of David Diaz, identified Jenkins as the shooter. Later that evening, two victims of the Robbery Pattern 101 crimes, Keith Golden and Vinette Tummings, identified Jenkins as one of their assailants. Several witnesses also identified Blyther. Both men were put in jail. Jenkins was arraigned on several counts of murder and robbery. Prosecutors presented evidence against Jenkins to two separate grand juries which indicted Jenkins on the murder and robbery charges.

During the course of Jenkins' criminal proceeding, the New York Supreme Court (Juviler, *J.*) held a hearing on Jenkins' motion to suppress the lineup identifications under *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Judge Juviler denied Jenkins' *Wade* motion, finding the lineups "free from undue suggestion," but granted Jenkins' *Dunaway* motion, finding the lineup identifications were "fruits of an unlawful arrest, without probable cause." The court then granted the prosecutor's request to demonstrate that courtroom identifications by these three witnesses would have a source independent of the lineup.

Almost eight months after the arrest, an assistant district attorney interviewed Blyther, who informed him that Harvey Dixon, not Jenkins, was the second perpetrator in the murder of David Diaz and the

---

1. It is undisputed by the parties that the police did not have a warrant for Blyther's arrest.

robbery of Keith Golden. In addition, Blyther noted that his accomplices in the other robberies were various "crack heads" from around the neighborhood. Blyther was clear that Jenkins was not involved in any of the Robbery Pattern 101 crimes.

Over three days in late March 2000, Judge Juviler conducted the independent source hearing. During the hearing, Chambers was asked whether the detectives conducting the lineup said anything to him to suggest whom he should pick out. Chambers responded that the lineup was "kind of pressured." "They said, you got to pick somebody. It was like, you got to get him. Pick somebody." During the break between the first and second days of the hearing, Chambers was presented with a photo array that included Harvey Dixon. Chambers then recanted his identification of Jenkins and instead identified Dixon as the man who shot Diaz. When asked why he picked Jenkins as the shooter during the precinct lineup, Chambers stated, "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody." Judge Juviler later noted that "[Jenkins] does resemble Dixon." Because Chambers was the only witness linking Jenkins to the Diaz murder, prosecutors decided to drop the murder charges against Jenkins. They continued to pursue the robbery charges, however, on the expectation that Judge Juviler would permit courtroom identifications by Tummings and Golden.

On April 6, 2000, Judge Juviler concluded that prosecutors failed to satisfy their burden of demonstrating that courtroom identifications by Golden and Tummings would have a source independent of the lineup identifications. With respect to Tummings, Judge Juviler indicated he was "troubled very much by the corrosive ef-

fect of the lineup procedure which came to light when Dr. Tummings testified." Judge Juviler found that when the police called Tummings to request that she come view the lineup, they told her that "they had caught the guy and that he fit her description." "Shortly after that, she learned from [Golden] that the police had found his watch on the guy. While we know that the guy turned out to be Blyther, this was not evident to Dr. Tummings." Judge Juviler stated that the conduct of the police, in conjunction with Tummings' eagerness to bring someone to justice, created a "serious risk" that Tummings would "pick[ ] out the person in the lineup who closest resemble[d] the person who had robbed her."

With respect to Golden, Judge Juviler found that the police had shown Golden his stolen watch after telling him that someone in the lineup was in custody. "The police did not say who in the lineup was the suspect and the person with the watch, but the police conduct in the context of the previous fact created a substantial risk that Golden would pick the person in the lineup who was most like the second robber."

With the eyewitness identifications suppressed, the District Attorney moved to dismiss the robbery charges. On May 12, 2000, all charges against Jenkins were dismissed. By the time of his release, Jenkins had spent nearly nine months in prison.

Jenkins filed a claim for damages under 42 U.S.C. § 1983 and New York law against the City of New York, the NYPD, and Detectives Mack, Parrino, Hunter and Schulman, asserting federal and state law false arrest claims, and various other claims. Defendants sought summary judgment on all causes of action. The district court divided Jenkins' false arrest claims into two groups based on the rele-

vant periods: (1) pre-lineup detention and (2) post-lineup detention.

With respect to Jenkins' pre-lineup detention, the district court noted Judge Juviler's finding that Jenkins' initial arrest was not supported by probable cause and gave that finding preclusive effect. The district court nevertheless dismissed Jenkins' pre-lineup claims, finding the detective defendants were entitled to qualified immunity. The district court noted that an arresting officer is immune from personal liability for false arrest so long as he has "arguable" probable cause. In the district court's view, Detectives Shulman, Hunter and Parrino [2] had arguable probable cause because, when they discovered Jenkins at Blyther's apartment, he "generally matched" the witnesses' descriptions of the second perpetrator and attempted to flee. The district court concluded that the detectives were reasonable in believing they had probable cause to arrest and were therefore entitled to qualified immunity.

With respect to Jenkins' post-lineup detention, the district court noted that during the *Wade/Dunaway* hearing Judge Juviler found that the lineups were "free from undue suggestion," and suppressed the lineups only because they were obtained as the fruit of an unlawful arrest. The district court held that "the fruit of the poisonous tree doctrine is a rule of evidence, applicable only in criminal trials and cannot be successfully invoked to support a § 1983 claim." The district court gave preclusive effect to Judge Juviler's initial finding that the lineups were free from suggestion; the court did not mention Judge Juviler's subsequent finding at

the independent source hearing that, in his view, the lineup procedures had a "corrupting effect." The district court concluded that after Chambers identified Jenkins as the shooter in the Diaz murder, Jenkins' arrest was based on probable cause. The district court therefore granted defendants' motion and dismissed Jenkins' post-lineup detention claims.

The district court also dismissed Jenkins' additional federal and state law claims, and his claims against the City of New York and the NYPD. This appeal followed.

## DISCUSSION

■■■ A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law.[3] *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Id.* (internal citations omitted); *see also Broughton v. State*, 37 N.Y.2d 451, 456–57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (N.Y.1975) (plaintiff will prevail on a claim of false arrest under New York law if he can show that the arrest was not privileged, i.e., not based on probable cause). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at

---

**2.** Detective Mack was not at the scene of Jenkins' arrest.

**3.** Plaintiff's complaint asserts claims for false arrest under the Fourth Amendment of the

U.S. Constitution, Article 1, § 12 of the New York Constitution, and New York common law.

852.[4]

## A. Jenkins' Pre–Lineup False Arrest Claims

▮ In the state criminal proceeding, Judge Juviler found that the police did not have probable cause to arrest Jenkins at Blyther's apartment. The district court gave that finding "preclusive effect," citing 28 U.S.C. § 1783[5] and *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). There is no doubt that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra*, 465 U.S. at 81, 104 S.Ct. 892. In our view, the proper application of New York law required that Judge Juviler's finding *not* be given preclusive effect.

▮ In New York, collateral estoppel has two essential elements. "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Juan C. v. Cortines*, 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 679 N.E.2d 1061 (N.Y. 1997) (internal citation and quotation marks omitted). Generally, a nonparty to the prior litigation may be collaterally estopped by a determination in that litigation only if he has "a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation." *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y.1990); *see also Brown v. City of New York*, 60 N.Y.2d 897, 898, 470 N.Y.S.2d 573, 458 N.E.2d 1250 (N.Y.1983).

The New York Court of Appeals has held that the relationship between a municipality and the district attorney is not one of privity. In *Brown*, the plaintiff sued the City of New York for false arrest and moved for summary judgment. 60 N.Y.2d at 897. Plaintiff asserted that the City was collaterally estopped from claiming probable cause for the arrest because the court in the criminal proceeding had determined that the plaintiff's arrest was unlawful. *Id.* The Appellate Division agreed, noting that the City had a full and fair opportunity to contest the prior determination "inasmuch as the State and the city, although distinct legal entities, had interests in the criminal prosecution making one privy to the other." *Id.* The Court of Appeals reversed: "The city and the District Attorney are separate entities and ... do not stand in sufficient relationship to apply the doctrine [of collateral estoppel]." *Id.* at 898.

▮ Detectives Mack, Shulman, Hunter and Parrino were witnesses in, but not parties to, Jenkins' criminal proceeding. The detectives are no more in privity with the State than the City was in *Brown*. For if the City is not in privity with the State, neither are the City's employees. It was therefore error for the district court to preclude defendants from asserting that

---

4. It is well established that we review de novo a district court's grant of summary judgment and construe the evidence in the light most favorable to the non-moving party. *United States v. All Funds Distributed To, or o/b/o Weiss*, 345 F.3d 49, 53–54 (2d Cir.2003).

5. Section 1783 provides that state court judgments "shall have the same full faith and credit in every court within the United States."

they had probable cause to arrest Jenkins.[6]

■ Although the district court held that the detectives lacked probable cause to arrest Jenkins as a matter of law, it found that they did have "arguable" probable cause and dismissed Jenkins' state and federal false arrest claims because the detective defendants were entitled to qualified immunity. "Qualified immunity" protects an official from liability under *federal* causes of action but is not generally understood to protect officials from claims based on state law.[7] Nevertheless, a similar doctrine exists under New York common-law.[8]

6. While defendants' brief to this Court argues that the district court misapplied section 1783, defendants did not file notice of appeal. We requested the parties to submit supplemental briefing on the question of whether this court has jurisdiction to correct the district court's error in the absence of a cross-appeal by defendants.

Federal Rule of Appellate Procedure 3(a) provides that an appeal from a district court "may be taken only by filing a notice of appeal with the district clerk...." The notice requirement applies to both appellants and appellees alike. An appellee cannot, without notice of cross-appeal, "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below." *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *see also Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1285 (2d Cir.1994) (citing *American Railway Express Company* for the same proposition).

Notwithstanding the fact that defendants did not cross-appeal the collateral estoppel ruling, we have jurisdiction to consider defendants' argument that this determination was error. Defendants' argument that the district court erred in finding a lack of probable cause as a consequence of collateral estoppel is advanced not "with a view either to enlarging [their] own rights [under the judgment] or of lessening the rights of [their] adversary," *Am. Ry. Express Co.*, 265 U.S. at 435, 44 S.Ct. 560, but rather as an alternative ground to support the district court's dismissal of Jenkins' false arrest claims. Defendants suggest that even if they are not entitled to qualified immunity, as the district court found, summary judgment dismissing Jenkins' pre-lineup false arrest claim was nevertheless appropriate because, in their view, the undisputed facts demonstrate that the arrest was based on probable cause. "It is an 'inveterate and certain' rule that a party need not cross-appeal in order to assert an alternate ground based on the record to support a district court decree." *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (quoting *Massachusetts Mutual Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976)). Moreover, " 'a party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree.' " *In re O'Brien*, 184 F.3d 140, 141 (2d Cir.1999) (quoting *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263 (1939)). A party may only advance an alternative argument in support of a decree in its favor in response to its adversary's appeal of the decree. Therefore, the absence of cross-appeal in this case does not prevent defendants from arguing that the district court should have found Jenkins' initial seizure to be based on probable cause.

7. *See Andreu v. Sapp*, 919 F.2d 637, 640 (11th Cir.1990) ("Qualified immunity is a defense to federal causes of action and does not protect officials from claims based upon state law."); *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir.1995) (same); *Gossman v. Allen*, 950 F.2d 338, 341 (6th Cir.1991) (denying qualified immunity where state law claims were not used to establish any violation of federal law); *Samuel v. Holmes*, 138 F.3d 173, 179 (5th Cir.1998) (holding that qualified immunity does not apply to state law claims absent an express provision in the state statute).

8. This is not surprising given the common law origins of qualified immunity for police officers accused of false arrest under section 1983. *See Malley v. Briggs*, 475 U.S. 335, 339–40, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (immunities recognized under 1983 always have a "common-law counterpart"). In

If the detective defendants were entitled to qualified immunity under federal law, summary judgment would be similarly appropriate on Jenkins' state law false arrest claim.

 Under federal law, a police officer is entitled to qualified immunity where "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir.2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). There is no doubt that the right to be free from arrest without probable cause was clearly established at the time of Jenkins' arrest. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000) (collecting cases). Therefore, Jenkins' federal false arrest claim turns on whether the detectives' probable cause determination was objectively reasonable. An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest—that is, if "officers of reasonable competence could disagree on whether the probable cause test was met." *Lennon v. Miller*, 66 F.3d 416, 423–24 (2d Cir.1995); *see also Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir.2004); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991).[9]

 "Arguable" probable cause should not be misunderstood to mean "almost" probable cause. The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed. *See Anderson*, 483 U.S. at 644, 107 S.Ct. 3034; *Saucier*, 533 U.S. at 207, 121 S.Ct. 2151 (section 1983 claims under the Fourth Amendment are evaluated for objective reasonableness). There should be no doubt that probable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.

*Imbler v. Pachtman*, the Supreme Court stated that, while construed literally § 1983 "creates a species of tort liability that on its face admits of no immunities," the section "is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." 424 U.S. 409, 417–18, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Thus, in *Pierson v. Ray*, 386 U.S. 547, 555–57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court held that local police officers sued for false arrest under section 1983 enjoy a "good faith and probable cause" defense "coextensive with their defense to false arrest actions at common law." *Imbler*, 424 U.S. at 418–19, 96 S.Ct. 984 (explaining *Pierson*).

9. Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). The Supreme Court has stated that to demonstrate entitlement to qualified immunity, the defendant need not establish subjective good faith, for that inquiry is inherently factual and requires resolution by jury. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–16, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To require a defendant to prove subjective good faith would undermine the very purpose of qualified immunity—to dismiss insubstantial claims against government officials before trial. *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 507–08, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). If, on the undisputed facts, the officer's probable cause determination was *objectively* reasonable, the officer is entitled to qualified immunity and summary judgment dismissing the suit is appropriate.

 In New York, the action of false arrest or false imprisonment "is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement." [10] *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (N.Y.1975). Where an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful. *Id.* at 458, 373 N.Y.S.2d 87, 335 N.E.2d 310. However, "[t]his presumption is rebutted if, applying the reasonable, prudent person test, the arresting officer, acting in good faith, had 'reasonable cause [11] for believing the person to be arrested to have committed [a felony].'" *Dillard v. City of Syracuse,* 51 A.D.2d 432, 435, 381 N.Y.S.2d 913 (N.Y.App.Div.1976) (quoting *People v. Coffey,* 12 N.Y.2d 443, 451, 240 N.Y.S.2d 721, 191 N.E.2d 263 (N.Y.1963)). While the requirement of "good faith" under New York law might be interpreted to require a factual determination of the officer's subjective intent, this is not the case. Similar to the federal doctrine, if, when the facts are construed in favor of the plaintiff, the officer's probable cause determination was *objectively* reasonable, the court under New York law should dismiss the plaintiff's false arrest claim at the summary judgment stage. *See Molina v. City of New York,* 28 A.D.3d 372, 373, 814 N.Y.S.2d 120 (N.Y.App.Div. 2006) (affirming dismissal of false arrest claim on summary judgment where undisputed facts indicated officers' probable cause determination was reasonable); *Iorio v. City of New York,* 19 A.D.3d 452, 453, 798 N.Y.S.2d 437 (N.Y.App.Div.2005) (same); *Batista v. City of New York,* 15

A.D.3d 304, 305, 790 N.Y.S.2d 445 (N.Y.App.Div.2005) (same).

 Thus, under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable. *See Cerrone,* 246 F.3d at 199; *Dillard,* 51 A.D.2d at 435, 381 N.Y.S.2d 913. If, however, on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.

The district court concluded that, on the undisputed facts, the detectives were reasonable in believing they had probable cause to arrest Jenkins at Blyther's apartment. We disagree. The district court based its finding of reasonableness on the following analysis:

> When they arrested [Jenkins], the officers knew that a second African–American man was alleged to have been involved in some of the incidents in Robbery Pattern 101 and Diaz's homicide. The officers were in possession of Conte's stolen red Honda on which they discovered Blyther's fingerprints. When the officers encountered [Jenkins] at 1280 St. John's Place, he was in the presence of Blyther, a known suspect in the crimes, and he generally matched the complainants' descriptions of the second perpetrator. These facts permitted the officers to

---

10. False arrest is simply false imprisonment accomplished by means of an unlawful arrest. 59 N.Y. Jur.2d False Imprisonment § 1. "False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest." *Id.*

11. In this context, the terms "reasonable cause" and "probable cause" are synonymous. *Veras v. Truth Verification Corp.,* 87 A.D.2d 381, 384, 451 N.Y.S.2d 761 (N.Y.App. Div.1982).

make the reasonable inference that [Jenkins] was involved in the crimes for which they set out to arrest Blyther. Furthermore, after the police identified themselves and apprehended Blyther, [Jenkins] fled from the apartment. A suspect's flight may provide reasonable suspicion that criminal activity is afoot. Thus, the officers could have reasonably believed that they were justified in detaining [Jenkins] after he ran out of the apartment.

Moreover, the officers could have reasonably believed that they lawfully detained [Jenkins] at the precinct for five hours until they organized the lineups and gathered witnesses to view them. (citations omitted).

 This analysis is flawed for several reasons. The district court's assertion that Jenkins attempted to flee is problematic, as that fact is vigorously disputed. Jenkins and Blyther testified that when Blyther opened his door, police stormed into the apartment, threw them both to the ground and placed them in handcuffs. Both men stated that they made no attempt to flee. Although Detective Mack testified that tackling a suspect attempting to flee is something he would note in a post-arrest report, not a single post-arrest document suggests that Jenkins or Blyther attempted to escape. Thus, Jenkins' flight was very much at issue. Because Jenkins' flight played an important part in the district court's finding of arguable probable cause, it was also clearly material. A district court may not grant summary judgment if there exists a genuine issue of material fact. *See Cotar-*

elo v. Village of Sleepy Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir.2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). On the defendants' motion for summary judgment, the district court was obligated to construe this factual ambiguity in Jenkins' favor. *See Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Instead, the district court construed the facts in favor of the detectives.[12]

The district court's assertion that Jenkins "generally matched the complainants' descriptions of the second perpetrator" is tenuous. Descriptions of the second perpetrator by witnesses of the Robbery Pattern 101 crimes and the Diaz murder revealed only two common characteristics: The second perpetrator was male and black. Aside from gender and race, the descriptions varied broadly, furnishing the detectives with an age range of 16 to 30 years, a height range of 5' 7" to 6' 3" tall, and a weight range of 140 to 200 pounds. The second perpetrator's hair was described as either a "short afro," in "long skinny braids," or "dread locks."

 On appeal, defendants wisely refrain from suggesting that because Jenkins' physical characteristics fell within these ranges the "match" established probable cause. They rely instead on the assertion that Jenkins matched the general description provided by Nancy Lorient. Lorient was robbed three days before Jenkins' arrest. She described both of her

---

12. In addition, although a suspect's flight may, under certain circumstances, provide reasonable suspicion to warrant a *Terry* stop, it does not, without more, provide probable cause to arrest. *See Illinois v. Wardlow,* 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Even if it had been undisputed that Jenkins attempted to flee, on that fact alone the detectives could only have detained Jenkins to "briefly investigate" his identity and possible connection with the Robbery Pattern 101 crimes. *See id.* at 126, 120 S.Ct. 673.

assailants as between twenty and twenty-five years of age, one as 5′ 6–8″ tall, 150 pounds, and the other as 5′ 6–8″ tall, 160 pounds. In addition, she indicated that one man had dread locks and wore a white t-shirt. As to the other, she initially indicated that he wore a blue t-shirt with burgundy "stripes;" however, two hours later she described the shirt as dark-colored with burgundy "letters." On the date of his arrest, Jenkins was twenty-six years old, six feet tall, 160 pounds, and wore a long-sleeved shirt with alternating bands of blue and orange (each about three inches in width).[13]

■ Officers may, in certain circumstances, base probable cause on a victim's description of her assailant. It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist. *Wong Sun v. United States,* 371 U.S. 471, 481, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Jackson,* 652 F.2d 244, 247–48 (2d Cir.1981); *United States v. Rosario,* 543 F.2d 6, 8 (2d Cir.1976). Although Jenkins' weight and age have some congruence to the estimates given by Lorient, these similarities hardly singled Jenkins out as an accomplice in the robbery. *See Jackson,* 652 F.2d at 248; *Rosario,* 543 F.2d at 8.

The extent to which Jenkins' shirt matched the one described by Lorient might have become significant to the prob-able cause determination, but only if Jenkins was tied to the Lorient crime through his presence at Blyther's home in the early morning hours. The district court referred to Blyther as a "known" suspect in the Robbery Pattern 101 crimes, and indeed he was. Blyther's fingerprints were discovered in the stolen Honda. The police therefore had probable cause to believe Blyther was involved in the six robberies in which the Honda was described by witnesses as the getaway vehicle. Lorient, however, indicated that the suspects approached and fled on foot. Thus, the police lacked probable cause to believe Blyther was involved in the Lorient robbery.[14] With nothing tying Blyther to the Lorient robbery, the fact that Jenkins was discovered in Blyther's apartment wearing a shirt somewhat similar to the one described by the victim three days earlier is at best a coincidence. It certainly does not establish probable cause.[15]

■ Probable cause is, of course, evaluated on the totality of the circumstances. *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990) (citing *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). A person's flight from the police, his presence in the company of an individual suspected of criminal activity, and the fact that he matches even a vague description provided by a witness, are certainly factors to be considered in evaluating probable cause. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

---

**13.** Blyther was 5′ 6″ tall, 158 pounds, and completely bald.

**14.** The last crime in which the Honda was described occurred on July 9, 1999. The only distinguishing characteristic common to the crimes in which the Honda was used and the Lorient robbery, which occurred on July 12, 1999, was the fact that a silver automatic handgun was displayed by one of the perpetrators.

**15.** Significantly, Detective Parrino, the only detective privy to the description provided by Lorient, was not in the apartment when Blyther and Jenkins were initially arrested. Detective Parrino first encountered Jenkins when he was brought downstairs in handcuffs by the other officers.

In this case, Jenkins' alleged flight was inappropriately factored into the district court's analysis as it was a disputed issue of fact. Moreover, under the particular circumstances of Jenkins' arrest, it would be unreasonable to base probable cause on his presence in Blyther's apartment and the description provided by Lorient. Jenkins did fall within the general physical description provided by Lorient and was wearing a shirt that might have been similar to the one she described, but there was no evidence connecting that crime to Blyther, let alone Jenkins. Jenkins' presence in Blyther's apartment, on its own, created no more than a suspicion worthy of investigation. Summary judgment dismissing Jenkins' false arrest claims for the pre-lineup period was therefore in error.

### B. Jenkins' Post–Lineup False Arrest Claims

The district court dismissed Jenkins' federal and state claims of false arrest for the post-lineup period because: (1) the identifications established probable cause to believe Jenkins committed the crimes and, thus, his arrest thereafter was lawful; and, alternatively, (2) the detectives reasonably believed they had probable cause for the arrest after the lineup identifications and were thus entitled to qualified immunity.

 The district court rejected Jenkins' argument that the police could not reasonably have relied on the lineups to establish probable cause because the lineups were improperly conducted. The district court felt bound to give preclusive effect to Judge Juviler's finding that "the lineups were properly conducted and free from undue suggestion." [16] Here as well, the district court misapplied New York's collateral estoppel jurisprudence. The error here, however, involves a different aspect of the doctrine. Jenkins was a party to the prior criminal proceeding and, thus, the identity of the parties requirement for preclusion is met. However, Jenkins' success in the criminal proceeding prevents invocation of collateral estoppel against him on this issue.

 In New York, the danger inherent in the doctrine of collateral estoppel—that an erroneous first decision on an issue will be perpetuated in subsequent litigation—is remedied to an extent by the requirement that the doctrine not be applied when there is no opportunity for appellate review. *See Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996) (citing *Malloy v. Trombley,* 50 N.Y.2d 46, 51, 427 N.Y.S.2d 969, 405 N.E.2d 213 (N.Y.1980)). "If a party has not had the opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue." *Id.* (citing *People v. Medina,* 208 A.D.2d 771, 617 N.Y.S.2d 491 (N.Y.App.Div.1994), *appeal denied,* 84 N.Y.2d 1035, 623 N.Y.S.2d 191, 647 N.E.2d 463 (N.Y.1995)). "Hence, collateral estoppel will not bar reconsideration of an issue if there is an inability to obtain review or there has been no review, even though an appeal was taken." *Id.* (citations omitted); *accord* RESTATEMENT (SECOND) OF JUDGMENTS § 28(1) cmt. a (1982) ("If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of [collateral estoppel] is inapplicable by its own terms.").

---

**16.** The district court correctly concluded that Judge Juviler's finding that the lineup identifications were "fruit of the poisonous tree" is of no effect in this civil proceeding. This Court previously has held that the fruit of the poisonous tree doctrine cannot be invoked to support a section 1983 claim, for the doctrine "is an evidentiary rule that operates in the context of criminal procedure" and "has generally been held to apply only in criminal trials." *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999).

This principle is of substantial import in the context of a criminal proceeding ultimately dismissed. "New York courts have held that facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges. This rule is predicated on the defendant's lack of an opportunity to obtain review of an issue decided against him." *Johnson,* 101 F.3d at 795–96 (citing, as examples, *Williams v. Moore,* 197 A.D.2d 511, 602 N.Y.S.2d 199 (N.Y.App.Div.1993); *People v. Howard,* 152 A.D.2d 325, 548 N.Y.S.2d 785 (N.Y.App.Div.1989), *appeal denied,* 75 N.Y.2d 814, 552 N.Y.S.2d 564, 551 N.E.2d 1242 (1990); *People v. Sweeper,* 127 A.D.2d 507, 511 N.Y.S.2d 860 (N.Y.App.Div. 1987)).[17] Once the criminal charges against Jenkins were dismissed, he had no reason to seek appellate review of Judge Juviler's earlier *Wade* ruling. Thus, Judge Juviler's finding that the lineups were not unduly suggestive was not final for collateral estoppel purposes. *See Williams,* 197 A.D.2d at 513, 602 N.Y.S.2d 199. At the summary judgment stage, therefore, the suggestiveness of the lineups is determined by reviewing all the facts in the light most favorable to Jenkins, not by reference to the state court's findings.

■ Tummings and Golden identified Jenkins at 6:00 p.m. and 6:20 p.m., respectively, on July 15, 1999. The conduct of the police in administering the Tummings and Golden lineups was less than perfect. It is true that at the *Wade/Dunaway* hearing Judge Juviler concluded that the lineups "were free from undue suggestion." However, at the subsequent independent

source hearing Judge Juviler concluded that "additional evidence had come to light" indicating that the lineup procedures "did have a corrupting effect." The police called Tummings and told her that they had caught the person who robbed her and that he had in his possession property belonging to one of the other victims. Tummings was then placed in a room with Golden, who earlier was told that his stolen watch had been recovered from one of the suspects. Golden shared this information with Tummings. Although the watch was recovered from Blyther, not Jenkins, this was not evident to Tummings or Golden. Tummings testified that she felt confident in identifying Jenkins in the lineup because the police "said they caught the person ... with another victim's stuff in the car that I described." The state court indicated that it was "troubled very much by the corrosive effect of the lineup procedure" because the police created a "substantial risk" that Golden and Tummings would simply pick an individual in the lineup who most closely resembled their assailant, rather than pick no one at all.

■ That conduct, however, did not negate the existence of probable cause. In New York, "[k]nowledge by a complainant that the suspect is in a lineup does not, of itself, taint the lineup." *People v. Ferrer,* 205 A.D.2d 305, 305, 613 N.Y.S.2d 865 (N.Y.App.Div.1994). "When a complainant is brought to a police station to view a lineup, it is implicit that the lineup will contain at least one suspect, otherwise there would be no point whatever in conducting the lineup." *People v. Green,* 14 A.D.3d 578, 579, 789 N.Y.S.2d 184

---

17. *Accord Wilson v. Steinhoff,* 718 F.2d 550, 552 (2d Cir.1983) (pretrial suppression hearing order "was neither a final judgment nor an essential precursor to what was in fact the final judgment, the unappealable judgment of acquittal"); *Crespo v. New York City Police Comm'r,* 930 F.Supp. 109, 115 (S.D.N.Y.1996) (holding that collateral estoppel does not apply where appellate review of a suppression determination in a prior proceeding was foreclosed by an acquittal).

(N.Y.App.Div.2005) (internal citation and quotation marks omitted). This Court similarly has held that although the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do so. *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir.1982). "It must be recognized ... that any witness to a crime who is called upon to view a police lineup must realize that he would not be asked to view the lineup if there were not some person there whom the authorities suspected." *United States v. Gambrill*, 449 F.2d 1148, 1151 n. 3 (D.C.Cir.1971).[18] Even when the facts are viewed in the light most favorable to Jenkins, the Golden and Tummings lineups were not so flawed as to undermine probable cause. Thus, after Jenkins was identified by Golden and Tummings, his detention was lawful and summary judgment on his state and federal false arrest claims for the period after those identifications was appropriate.

■ Chambers' earlier identification, however, is problematic. Chambers testified that on two occasions the police told him that he had to pick someone out of the lineup. Chambers picked Jenkins, but eventually recanted that identification and instead picked Harvey Dixon out of a photo array as the man who shot Diaz. When asked why he picked a different person in the photo array than at the lineup, Chambers responded, "Because the detectives

were, like, you had to pick somebody. And I just wanted to go home and they were just, like, forcing me to pick somebody." Taking Chambers testimony as true, the police did more than simply increase the odds that he would pick a person most closely resembling the perpetrator rather than pick no one at all. They took the option to not pick anyone off the table. Such conduct would render the lineup so defective that probable cause could not reasonably be based upon it.

In sum, while summary judgment dismissing Jenkins' post-lineup false arrest claims on the basis of the Chambers identification was error, summary judgment dismissing Jenkins' false arrest claims for the period after he was identified by Golden and Tummings was appropriate.

## C. Liability of the City of New York [19]

■ Jenkins' complaint also names the City of New York as a defendant. Jenkins alleges that the City, through its agency, the NYPD, "grossly failed to train and adequately supervise its police officers in the fundamental law and procedure of arrest, search and seizure...." The district court dismissed Jenkins' federal false arrest claim against the City, relying on *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the Supreme Court held that a municipality may be found liable under section 1983

18. In each of these cases, the witness's knowledge that the suspect was in the lineup was discussed in the context of whether the lineup could be admitted against the defendant in his criminal trial, not whether the lineup established probable cause. For present purposes, this distinction is unimportant. If a particular defect in a lineup procedure generally does not render the lineup impermissibly suggestive for purposes of admissibility, neither does it do so for purposes of establishing probable cause.

19. Jenkins sued the City of New York and the NYPD separately. The district court correctly noted that the NYPD is a non-suable agency of the City. *See Wray v. City of New York*, 340 F.Supp.2d 291, 303 (E.D.N.Y.2004) (quoting N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.")).

only where the municipality itself causes the constitutional violation at issue. *Id.* at 691, 98 S.Ct. 2018.

The district court apparently dismissed Jenkins' state law claim of false arrest against the City as well, but failed to provide any explanation as to why it did so.

### 1. Section 1983 Claim against the City of New York

 Jenkins argues that the City is liable because it failed to train and adequately supervise its employees. This is a permissible theory of liability under § 1983. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Walker v. City of New York,* 974 F.2d 293, 300 (2d Cir.1992). However, under the so-called "failure to train" theory, the Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris,* 489 U.S. at 388, 109 S.Ct. 1197. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*

 This Court has identified three requirements before a municipality's failure to train or supervise constitutes deliberate indifference. *Walker,* 974 F.2d at 297. "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* (citing *Harris,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is

a history of employees mishandling the situation." *Id.* "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298. "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Green v. City of New York,* 465 F.3d 65, 81 (2d Cir.2006) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004)).

In granting defendants' summary judgment motion on Jenkins' section 1983 claims against the City, the district court noted, "[Jenkins] argues that he was subjected to unduly suggestive lineups due to the City's failure to train its police officers, which constitutes a policy or custom for which the City can be held liable under § 1983." The district court again gave preclusive effect to Judge Juviler's initial finding that the lineups were "fair and free from suggestion," and concluded that Jenkins did not present "any evidence sufficient to raise a genuine issue of material fact as to whether the City failed to train or supervise its employees in identification procedures with deliberate indifference to his rights." As discussed above, the doctrine of collateral estoppel does not apply in this context. In addition, the district court failed to acknowledge that Jenkins' section 1983 false arrest claim against the City was predicated not only on the flawed lineup procedures, but also on his initial unlawful arrest. Nevertheless, summary judgment dismissing the federal false arrest claim against the City was appropriate.

 While Jenkins claims he was falsely arrested because the City, through its agency, the NYPD, "grossly failed to train

and adequately supervise its police officers in the fundamental law and procedure of arrest, search and seizure," he failed to allege any facts to support this claim. Jenkins has not identified a specific deficiency in the training program that accounts for his unlawful arrest.[20] *See Green*, 465 F.3d at 81. He asserts, instead, that a lack of adequate police training is established by the fact that he was arrested without probable cause. The mere fact that Jenkins was falsely arrested, without more, does not show that the City's training program is inadequate. A training program is not inadequate merely because a few of its graduates deviate from what they were taught.

■ Nor did Jenkins allege facts suggesting that any shortcomings in the lineup procedures were the consequence of training or supervisory deficiencies. In his brief to this Court, Jenkins states that "the Defendant police conducted several highly suggestive lineups without any other evidence or probable cause to arrest [him]" and, because four of the officers involved were promoted the following year, "the City condoned their ... failure to follow identification procedures." Jenkins does not identify procedural manuals or training guides, nor does he highlight a particular aspect of police training or supervision that was responsible for how the lineups were conducted. He relies solely on the evidence that came to light at his criminal proceeding regarding his own lineups. Jenkins' personal experience, without more, is insufficient to prove "deliberate indifference" on the part of the City. Moreover, the fact that the officers were subsequently promoted, on its own, does not establish condonation.

Because Jenkins failed to allege facts establishing that any constitutional deprivations he suffered were a consequence of the City's failure to adequately train or supervise its officers, summary judgment dismissing his section 1983 claim of false arrest against the City was proper.

### 2. State Law Claim Against the City of New York

The district court dismissed Jenkins' state law false arrest claims against the City without explanation. Upon remand, the district court is instructed to determine whether Jenkins has alleged facts which, if true, are sufficient to establish the City's liability for the claimed misconduct of its employees.[21]

---

20. Jenkins does state, "Defendant NYC failed to implement a policy with its Police Department for its police officers, that a fingerprint search, photograph or other identifiable characteristic search should be conducted in every case where an individual was detained on no reasonable identifying characteristics. This official policy had the same force and effect of encouraging unlawful imprisonment...." We fail to see how this is true in Jenkins' case. After he was identified by two witnesses as the perpetrator, there is nothing such a search could turn up that would have prevented him from going to jail.

21. The standard for a claim of false arrest against the City under New York law is different from that under section 1983. *See* N.Y. Court of Claims Law § 8 (1989) ("The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations, provided the claimant complies with the limitations of this article."); *Whitmore v. City of New York*, 80 A.D.2d 638, 436 N.Y.S.2d 323, 325 (N.Y.App.Div.1981) ("The [City] may ... be held responsible for the alleged misconduct of the members of its own police department...."); *Caminito v. City of New York*, 45 Misc.2d 241, 256 N.Y.S.2d 670, 683 (N.Y.Sup.Ct.1965) ("If plaintiff establishes to the satisfaction of a jury that defendant's police officers were guilty of false arrest or malicious prosecution, since the State of New York has waived immunity pursuant to section 8 of the Court of

### D. Other Claims

We agree with the district court that with respect to Jenkins' claims for malicious prosecution, libel, slander, and intentional infliction of emotional distress, Jenkins failed to raise a triable issue of fact and defendants were entitled to summary judgment as a matter of law.

### CONCLUSION

The district court's December 8, 2005 judgment dismissing Jenkins' pre-lineup false arrest claim is VACATED, while that portion of the judgment dismissing Jenkins' post-lineup false arrest claims is AFFIRMED, although for different reasons than those offered by the district court, and only for the period after the Golden and Tummings identifications. In addition, that portion of the judgment dismissing Jenkins' section 1983 claim against the City of New York is AFFIRMED, while the portion dismissing Jenkins' state law false arrest claim against the City of New York is VACATED. Finally, the portion of the judgment dismissing Jenkins' claims for malicious prosecution, libel, slander and intentional infliction of emotional distress is AFFIRMED. Accordingly, we REMAND for further proceedings consistent with this opinion.

Claims Act, the defendant City of New York would be liable for all of the damages sustained by the plaintiff by reason of the misconduct of its employees.'').