10-952-cv (L)
Hargroves v. City of New York

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 22nd day of February, two thousand eleven.

PRESENT:

> JOSÉ A. CABRANES,
> DENNY CHIN,
>    *Circuit Judges*,
> JOHN F. KEENAN,
>    *Judge*.[*]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TYREE HARGROVES, LAVAR HARGROVES, and DAVID ALLEN,

> *Plaintiffs-Appellees*,

BRANDON HARGROVES and KENNETH WRIGHT,

> *Plaintiffs*,

v.     Nos. 10-952-cv (L), 10-961 (Con), 10-1003 (Con) 10-1009(Con)

CITY OF NEW YORK, BARRY CULPEPPER, Officer, and JOSEPH LIOTTA, Officer,

> *Defendants-Appellants*,

---

[*] The Honorable John F. Keenan, of the United States Court for the Southern District of New York, sitting by designation.

JOHN WARNER and VARIOUS "JOHN DOE" OFFICERS,

    *Defendants.*


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| **FOR APPELLANTS:** | MORDECAI NEWMAN, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel, *on the brief*, and Larry A. Sonnenshein, *of counsel*), City of New York, New York, NY. |
| **FOR APPELLEES:** | MICHAEL B. LUMER (Steven M. Weiner, *of counsel*), Reibman & Weiner, Brooklyn, NY, *for appellees* Tyree Hargroves and Lavar Hargroves. |
| | Michael R. Scolnick, Airmont, NY, *for appellee* David Allen. |

Appeal from a March 4, 2010 order entered in the United States District Court for the Eastern District of New York (Roslynn R. Mauskopf, *Judge*).

**UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order of the District Court be **REVERSED**.

Defendants-Appellants, City of New York, Barry Culpepper, and John Liotta (jointly, "defendants"), bring this interlocutory appeal following the entry of an order denying their motion for summary judgment. The principal issue before us is whether defendants are entitled to qualified immunity from plaintiffs-appellees' ("plaintiffs") claims of false arrest, false imprisonment, racial profiling, and malicious prosecution.

## I.  Background

On March 20, 1998, at approximately 11:30 p.m., a Chinese food delivery man, Zhi Wu, was attacked and robbed near 100-41 196th Street in Queens, New York. The assailants hit, punched, and kicked Wu, stealing his cash and food before fleeing the scene. Approximately half an hour later, Wu was interviewed by Officers Culpepper and Liotta at the crime site. Wu informed these policemen that he was attacked by a large group of black males, one of whom was wearing an orange jacket. According to Officer Culpepper, Wu expressed confidence that he could identify his attackers if he saw any of them again.

At this point, Culpepper and Liotta returned to their vehicle to begin searching the neighborhood for possible suspects. According to Liotta, the officers were initially only looking for a large group of black males, but later received a message that one of the suspects was wearing an

2

"orange and black jacket." For his part, Culpepper explained that he was looking for someone wearing "something like an orange coat." Culpepper testified, also, that during the search, he received a report that one of the suspects was armed with a gun.

Approximately ten minutes after first beginning the search, Culpepper noticed a large group of young, black males walking in a long, staggered line down Jamaica Avenue, several blocks from the site of the attack. Culpepper and Liotta pulled over in front of the group, stopped them, and called for backup.

> As the District Court observed:
>
> It is here that the accounts of Defendants and Plaintiffs diverge significantly. Culpepper claimed that he stopped the group of black males because "they were close to the scene of the crime, the time of night, the fact that the males were the only persons that Culpepper observed during the canvass, the fact that one of the males wore a jacket matching the description provided to him by Wu and what he heard over the radio run, the age of the males and the fact that they were black." Culpepper also claims that he saw that one of the persons in the group, whom he later identified as Lavar Hargroves, was wearing what he described as "like an orange jacket" or "a jacket with some orange on it" or a "red orange jacket." Liotta claimed that he observed one of the individuals wearing a black and orange jacket. Plaintiffs, on the other hand, argue that the evidence establishes that no member of their group was wearing anything that could be termed an orange jacket, whether orange or black and orange. They claim that the only possible reason Culpepper and Liotta had for stopping them was because they were male and black.

*Hargroves v. City of New York*, 694 F. Supp. 2d 198, 204 (E.D.N.Y. 2010) (citations omitted).

The parties also sharply disagree about critical details of the identification procedure subsequently orchestrated by Culpepper and Liotta. Culpepper arranged to have Wu brought to the street location where the suspects were being detained. Wu was seated in the back of a patrol car. According to defendants, each member of the group—eleven people in all—was individually presented to Wu for identification. Wu then positively identified seven of the eleven individuals as having attacked him earlier in the evening. Plaintiffs, on the other hand, maintain that only the seven individuals eventually identified as attackers were ever presented during this "show-up" procedure. *Hargroves*, 694 F. Supp. 2d at 204. Furthermore, plaintiffs note that Culpepper and Liotta failed to take any contemporaneous notes of the show-up procedure, so it is difficult to know details such as the order, distance, and appearance of the detainees as presented to Wu. For instance, in a 2007 deposition, Culpepper could not recall the average distance between Wu and the detainees—whom Wu had to examine through the front windshield of the squad car—but this distance had been approximated earlier as being roughly 20 feet.

Finally, there is conflicting evidence regarding Wu's physical condition during the show-up procedure. Plaintiffs point to testimony in the record that Wu's "face was all battered up like somebody kicked him," as well as Wu's own testimony that his eyes were bloodied and swollen and

3

his eyeglasses were damaged during the attack earlier in the evening. In turn, defendants insist that Wu had no difficulty in identifying his assailants.

The seven individuals indentified by Wu—Tyree Hargroves, Lavar Hargroves, Brandon Hargroves, Kenneth Wright, David Allen, Lawrence Strickland, and Delroy Ridley—were arrested on site and taken to Central Booking on the basis of Wu's identification. No gun was recovered from any of the suspects, nor were any of the stolen items found. The seven men were all subsequently indicted on two counts of robbery in the first degree, robbery in the second degree, assault in the first degree, gang assault in the first degree, gang assault in the second degree, and criminal possession of a weapon in the second degree. On May 23, 2000, a Queens County jury convicted all seven of the criminal defendants on various counts of the indictment. On July 29, 2002, the Appellate Division, Second Department, reversed the conviction of Brandon Hargroves on the grounds that Culpepper and Liotta lacked reasonable suspicion to detain him. In relevant part, that court explained:

> Even if the jacket worn by one member of the group that included the defendant can be considered orange rather than red and blue, this general description was not sufficient to permit the police to detain and then exhibit the defendant, among others, to the complainant. We further note that the group was walking towards the crime scene and did not flee when stopped by the police. Thus, the police lacked reasonable suspicion to stop and detain the defendant and the hearing court should have granted that branch of the omnibus motion which was to suppress the identification testimony.

*People v. Hargroves*, 745 N.Y.S.2d 579, 579-80 (App. Div. 2d Dep't 2002). The other six convictions were later overturned by the Second Department on the basis of this decision.

In 2003, after being released from prison, five of the seven former criminal defendants—Tyree Hargroves, Lavar Hargroves, Brandon Hargroves, Kenneth Wright, and David Allen[1]—commenced the instant actions (which were consolidated below) against defendants alleging violations of 42 U.S.C. § 1983 for false arrest, false imprisonment, racial profiling, and malicious prosecution.[2] The District Court denied defendants' motion for summary judgment—on the basis of qualified immunity—on these claims, and this interlocutory appeal followed.

## II.    Discussion

"The denial of summary judgment is ordinarily an interlocutory decision, not a 'final decision' appealable under 28 U.S.C. § 1291." *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir. 1996).

---

[1] Following the District Court's denial of defendants' motion for summary judgment, Brandon Hargroves and Kenneth Wright accepted an Offer of Judgment pursuant to Fed. R. Civ. P. 68.

[2] David Allen initially brought a handful of other claims, but these have since been dismissed. *Hargroves v. City of New York*, 694 F. Supp. 2d at 219.

"When a court denies a motion for summary judgment based on a denial of qualified immunity, however, that determination is appealable under the collateral order doctrine when it is a legal conclusion made with reference only to undisputed facts." *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). But when a denial of qualified immunity at the summary judgment stage is predicated on an underlying *factual* dispute, we lack jurisdiction to consider the matter under the collateral order doctrine. *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Caldarola*, 298 F.3d at 161. We can, however, review the District Court's legal conclusions *de novo* so long as we construe all factual disputes identified by the court below in favor of the plaintiffs. *Caiozzo v. Koreman*, 581 F.3d 63, 68 (2d Cir. 2009).

### *(1) – False Arrest, False Imprisonment, and Racial Profiling*

Defendants Culpepper and Liotta (jointly, the "officers") assert that they are entitled to qualified immunity on plaintiffs' § 1983 claims of false arrest, false imprisonment, and racial profiling.[3] Probable cause "is a complete defense to an action for false arrest." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.'" *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001)). "Ordinarily, determining whether official conduct was objectively reasonable require[s] examination of the information possessed by the officials at that time (without consideration of subjective intent)." *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003) (quotation marks omitted).

There is no dispute that the right to be free from arrest without probable cause was clearly established as of March 20, 1998. Plaintiffs' false arrest claims thus turn on whether the officers acted with probable cause, or, alternatively, whether their probable cause determination was at least objectively reasonable—"[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins*, 478 F.3d at 87 (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)). "[T]he Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The District Court began its analysis of this issue by correctly explaining probable cause as follows:

---

[3] False arrest "is a species of false imprisonment," so both claims are subject to the same legal analysis for purposes of this order. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

There is probable cause if "the arresting officer [has] knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (internal quotations omitted). In addition, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Id.* (internal quotations omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations and citations omitted). Moreover, "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer* [*v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995].

*Hargroves v. City of New York*, 694 F. Supp. 2d at 207-08.

<u>The Arrest</u>

Plaintiffs were arrested after Wu identified each of them during the show-up procedure. Ordinarily, the identification, by an eyewitness, of a suspect will likely be sufficient to establish probable cause for an arrest. *See Russo v. City of Bridgeport*, 479 F.3d 196, 199, 204 (2d Cir. 2007). However, "the existence of probable cause is to be determined on the basis of the totality of the circumstances," *Kent v. Katz*, 312 F.3d 568, 576 (2d Cir. 2002), through an inquiry into whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause or arguable probable cause to arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Here, the District Court found that a genuine dispute existed between the parties as to the condition of Wu's face—particularly his eyes and eyeglasses—during the show-up procedure, as well as the distance between Wu and the plaintiffs during the identification process. *See Hargroves v. City of New York*, 694 F. Supp. 2d at 209. Additionally, the parties disagree "as to whether each member of the group was presented to Wu or whether only the seven individuals eventually identified as attackers were presented."[4] *Id.* at 204. Assuming that Wu's face was obviously battered to a significant extent and that Wu promptly identified all of the suspects that were presented to him at a distance of up to 40 feet, the District Court was unwilling to hold that it was objectively reasonable for the officers to conclude that such an identification constituted probable cause to arrest the plaintiffs. We disagree.

The record indicates that at their initial meeting shortly after the robbery took place, Wu informed the officers that he could identify the assailants if given that opportunity. More importantly, Wu has subsequently given uncontroverted testimony that, during the show-up

---

[4] If all eleven detained persons were presented to Wu, it would bolster the officers' position that Wu was arguably able to provide credible identifications.

procedure itself, he assured the officers that he was capable of identifying the individuals involved in the robbery. It may well be the case that, given the extent of his facial injuries and the trauma he had recently experienced, Wu's self-confidence was misplaced. Nevertheless, in light of the facts contained in the record, we have no trouble concluding that it was objectively reasonable for Culpepper and Liotta to credit Wu's identifications. By his own testimony, buttressed by that of the officers, Wu made his identifications without reservation: at no point did he indicate to the officers that he was having trouble with his eyesight. We cannot say that the physical infirmities alleged by plaintiffs—the swollen face, a burst blood vessel in one eye, and damaged glasses—necessarily precluded a reasonable officer from accepting Wu's assurances that he had reliably identified his attackers. Importantly, there is no evidence in the record that Wu's conduct prior to and during the show-up suggested any traces of blurred vision, or that his facial injuries required urgent medical care. In considering the totality of the circumstances confronting the officers at the time, we conclude that Culpepper and Liotta did not behave unreasonably in accepting Wu's identifications, even if the show-up procedure (as described by plaintiffs) used to produce the identifications in question could have been structured more formally in light of Wu's injuries. While the officers may not have made sufficient allowance for Wu's potential physical impairments, we cannot say that Culpepper and Liotta acted incompetently or in knowing violation of the law in believing that they had probable cause to arrest the plaintiffs once they had been visually identified by the victim.

The Initial Detention

We also hold that the District Court erred in denying the officers qualified immunity for any liability relating to the initial stop.[5] Plaintiffs allege that they were detained solely because they were a large group of black males walking in the general area of the crime scene. In support of this contention, they draw our attention to a variety of evidence in the record. For instance, Culpepper acknowledged that Wu provided him with only "a vague description" of his assailants, and did not offer any physical descriptions beyond their race and sex.

Then there is the matter of the "orange jacket." As the District Court observed, the parties agree that, based on Wu's early account, the officers had reason to believe that at least one of the assailants was wearing some sort of orange jacket. *Hargroves v. City of New York*, 694 F. Supp. 2d at 208-09. But the record is unclear as to exactly what kind of jacket the officers were looking for. Culpepper stated that he was looking for someone in an "orange jacket," but could not recall whether he was then under the impression that that meant the jacket was entirely orange, mostly

---

[5] The "fruit of the poisonous tree" doctrine does not apply to civil actions brought under § 1983, *see Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999); therefore, we may analyze the initial stop independently of Wu's subsequent identifications.

7

orange, or just partially orange. For his part, Liotta testified that he was on the alert for a black male wearing an "orange and black jacket."

In explaining his initial decision to detain the group of black males in question, Culpepper testified that "the group stood out because that particular night that they were the only individuals out on the street corner that particular night, and that one person [subsequently identified as Lavar Hargroves] did have like an orange jacket on." But plaintiffs vigorously deny that Lavar Hargroves—or any of his compatriots—was wearing an orange coat on the night of March 20, 1998.

Due to the procedural posture of this interlocutory appeal, we need not—indeed, we cannot—inquire as to whether this purported factual dispute over the true color of Lavar Hargroves's jacket is actually "genuine." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) ("For factual matters, we review 'whether a given factual dispute is 'material' for summary judgment purposes, . . . but we may not review whether a dispute of fact identified by the district court is 'genuine.'" (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004))). The District Court specifically identified the color of Lavar Hargroves's jacket to be one of genuine dispute between the parties, *Hargroves v. City of New York*, 694 F. Supp. 2d at 209, and so we do not review, much less dispute, that finding.

We are mindful that "[o]fficers may, in certain circumstances, base probable cause on a victim's description of [his] assailant [, but] [i]t has long been established . . . that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins*, 478 F.3d at 90. Culpepper and Liotta acknowledged that they conducted their search looking only for a large group of black males, at least one of whom was wearing an orange coat of some kind. The officers insist that even if Lavar Hargroves was not wearing an orange jacket, they should still be entitled to qualified immunity because a reasonable officer could easily have mistaken Lavar Hargroves's red and blue jacket as being orange and black, particularly at night. We agree.

Plaintiffs themselves concede that Lavar Hargroves was wearing a red and blue jacket at the time of his arrest. Additionally, the jacket included "what appears to be a reflective, lighter red inner lining." *Hargroves v. City of New York*, 694 F. Supp. 2d at 205. For purposes of qualified immunity analysis, we need only consider whether it was "objectively reasonable" for the officers to believe, in the circumstances presented, that they had the legal authority to detain the plaintiffs. Thus, the District Court's focus on the *actual* color of Lavar Hargroves's jacket was, in our view, misplaced. Instead, we must decide whether an officer of reasonable competence could properly have believed that Lavar Hargroves (and the rest of his group) matched the description provided by Wu, even if the description of Hargroves's jacket was not precisely accurate.

8

In light of the record regarding the jacket at issue here, it was not unreasonable for the officers to think that plaintiffs matched the description provided by Wu. Again, Wu told the officers that he had been attacked by a large group of black men, at least one of whom was wearing an orange jacket of some kind. Shortly after the attack, Culpepper and Liotta spotted a large group of black men just a few blocks from where the robbery took place. One member of the group was wearing a bright jacket of some kind that could reasonably—if, albeit mistakenly—be perceived as being a shade of orange. Given the totality of the circumstances—including the age, race, and gender of the members of the group, the size of the group, the temporal and geographic proximity to the crime scene, and the absence of any other large groups in the area—we hold that, even as viewed in the light most favorable to plaintiffs, the record in this case establishes that the officers acted reasonably (that is, not incompetently or in knowing violation of the law) in their initial stop of plaintiffs and the ensuing "show-up" with the victim.[6]

### (2) – Malicious Prosecution

Defendants also challenge the District Court's ruling that the officers were not entitled to qualified immunity on plaintiffs' malicious prosecution claims. "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997).

"'[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York,' and 'indictment by a grand jury creates a presumption of probable cause[.]' That presumption may be rebutted only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id.* 161-62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)) (citations omitted). In considering this question, the District Court stated: "The key issue is whether Culpepper and Liotta lied to the prosecutors or the judge about what colors were on the Plaintiffs' jackets when they were arrested. Looking at the record as a whole, it is quite clear that a genuine issue of material fact remains

---

[6] We take this opportunity to point out one error made by the District Court, albeit in *dicta*, in its analysis of the probable cause issue. After explaining why the dispute over the color of the jacket was genuine and material, the District Court stated: "In addition, the decision of the Second Department establishes that even if Lavar Hargroves' jacket was, in fact, orange, and not blue and red, Defendants still lacked reasonable suspicion to detain Plaintiffs or to present them to Wu for identification." *Hargroves v. City of New York*, 694 F. Supp. 2d at 209. The District Court erred in its view that the determinations made by the Second Department in plaintiffs' *criminal* proceedings are entitled to preclusive effect in the instant case. We have held that, under New York law, police officers are not in privity with the State, and thus cannot be bound by the doctrine of collateral estoppel insofar as earlier criminal proceedings are at issue. *See Jenkins*, 478 F.3d at 85.

9

unresolved—namely what colors the jackets were." *Hargroves v. City of New York*, 694 F. Supp. 2d at 215. But, as explained above, even if Lavar Hargroves's jacket was red and blue—as plaintiffs assert—it would be easy for a reasonable officer to have mistaken red for orange. Such a mistake alone is not enough to suggest, much less show, that defendants "lied" to the prosecutors or the judge about what they saw. We find no other evidence in the record supporting plaintiffs' claim that the officers knowingly *misled* the prosecutor and the trial judge. Indeed, it was Culpepper who took the photographs of the plaintiffs on the night of the arrest that establish, according to the plaintiffs, that Lavar Hargroves was not wearing an orange jacket on the night of his arrest. These photographs were never hidden from the prosecutor's office. While Culpepper and Liotta may have provided incorrect information about what they observed on the night of March 20, 1998, the record provides no basis for concluding that either officer knowingly gave false testimony or otherwise acted in bad faith. Accordingly, plaintiffs' claims of malicious prosecution must fail.

### III. Conclusion

For the foregoing reasons, the judgment of the District Court is **REVERSED**. Judgment for defendants shall enter on the basis of qualified immunity on all of plaintiffs' claims.

FOR THE COURT,
Catherine O'Hagan Wolfe, Clerk of Court

10